**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JOSUE HERNANDEZ and SERGIO HERNANDEZ, individually and on behalf of all others similarly situated,<br><br>                         Plaintiffs,<br><br>   v.<br><br><br>LIFTED LIQUIDS, INC., an Illinois corporation,<br><br>                    Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

## **NATURE OF THE ACTION**

1.      This class action aims to hold Defendant Lifted Liquids, Inc. responsible for masquerading products containing delta-9 tetrahydrocannabinol ("THC"), a federally controlled Schedule 1 drug, as what appear to be their exact opposites in the marketplace: purportedly lawful delta-8 or delta-10 vape products derived from hemp. Consumers purchase Defendant's products believing they are perfectly legal and safe to use, and instead receive products criminally outlawed in many states throughout the country (and federally) and could result in them get fired for a failed drug test or serving prison time for driving under the influence, possession, or use. Defendant's conduct is worse than, *e.g.*, selling purportedly non-alcoholic beer that is in fact alcoholic. Mere possession of the products actually sold is a crime.

2.      Delta-9 THC derived from marijuana is a federally controlled Schedule 1 drug. On the other hand, delta-8 and delta-10 products derived from hemp are legal to sell, purchase, and possess in most jurisdictions so long as the products contain less than 0.3% delta-9 THC.

3.      When manufacturers misrepresent delta-9 THC content in delta-8 or delta-10 vape products, consumers face serious risks to their health, safety, and livelihood. Users who choose these products for their advertised low delta-9 THC content may unexpectedly experience stronger psychoactive effects than intended, which can lead to anxiety, panic attacks, impaired coordination, and dangerous situations like driving while unknowingly intoxicated. This misrepresentation is particularly harmful for individuals who need to maintain sobriety for employment or medical reasons.

4.      The deceptive labeling can also have devastating personal consequences for consumers who rely on the accuracy of THC content for drug testing compliance. Individuals may fail workplace or legal drug screenings due to consuming higher levels of delta-9 THC than

disclosed, potentially resulting in job loss, revocation of professional licenses, loss of custody rights, or violations of probation or parole requirements. This is particularly true in states where delta-9 THC from cannabis remains illegal both federally and at the state level. The manufacturer's dishonesty thus threatens not just consumers' immediate physical safety, but their economic security and personal freedom as well.

5. This case involves Defendant's widespread, deceptive representations that its delta-8 and delta-10 vape products contain less than 0.3% delta-9 THC. The labels of each of Defendant's products contain the representation: "<.3% D9 THC."

6. However, this representation is false. Independent laboratory testing confirms Defendant's delta-8 and delta-10 products in fact contain significantly more than 0.3% delta-9 THC. Accordingly, Defendant's products are considered "marijuana" products (*i.e.*, cannabis with more than 0.3% delta-9 THC) under federal law, and not lawful products derived from "hemp" (i.e., cannabis with less than 0.3% delta-9 THC), and are therefore a Schedule 1 controlled substance.

7. By deceiving consumers about the content of its products, Defendant is able to take away market share from competing products and increase its own sales and profits. Consumers lack the ability to test or independently ascertain the true delta-9 THC content at the point of sale. Reasonable consumers must and do rely on Defendant and its competitors to honestly report the nature of their products and their ingredients. The representations that the products contain less than 0.3% delta-9 THC communicate to reasonable consumers that the product is specifically formulated to comply with federal law and minimize the risk of unexpected psychoactive effects, anxiety, panic attacks, impaired coordination, and failed drug

tests. The fact that the products contain greater than 0.3% delta-9 THC directly contradicts this claim.

8. Plaintiffs bring this action individually and on behalf of similarly situated consumers who purchased Defendant's delta-8 and delta-10 products that were falsely and misleadingly labeled as having less than 0.3% delta-9 THC. Plaintiffs seek to represent a putative nationwide class, Texas and Florida subclasses, and multi-state classes seeking damages, interest thereon, reasonable attorney fees and costs, restitution, equitable relief, and disgorgement of all benefits Defendant has enjoyed from its unlawful and deceptive business practices, as detailed herein. In addition, Plaintiffs seek injunctive relief to stop Defendant's unlawful conduct in the labeling and marketing of the products. Plaintiffs make these allegations based on their personal knowledge as to themselves and their own acts and observations and, otherwise, on information and belief based on investigation of counsel.

## PARTIES

9. Defendant Lifted Liquids, Inc. is an Illinois corporation, incorporated on January 7, 2020. Its registered agent is Corporate Creations Network Inc., 1320 Tower Road, Schaumburg, IL 60173.

10. Defendant designs, manufactures, advertises, distributes, and sells a variety of delta-8 and delta-10 vape pens and cartridges under its in-house brand, Urb, both online at www.urb.shop and in retail stores across the United States. The products at issue in this case include: Urb brand delta-8 and delta-10 disposable devices and cartridges, including Flight Fuel disposable devices and cartridges, Mile High disposable devices and cartridges, Aerovape disposable devices, Smart Device disposable devices with delta-8 THC distilllate, Saucy THC Diamonds disposable devices and cartridges, Iced Diamonds disposable devices, "incredibles"

disposable devices, Liquid Badder disposable devices and cartridges, Live Sugar disposable devices, Live Resin cartridges, THC Infinity and THC Infinity Plus disposable devices and cartridges, Diamond Supply Co. disposable devices, and Koko Puffz and Koko Puffz Liquid Diamonds disposable devices (collectively, the "Products"). The Products are sold in 1.5ML, 3ML, 4ML, and 6ML sized disposable devices and 1ML, 2ML, and 2.2ML sized cartridges and myriad flavors. Defendant is responsible for the labeling of the Products, and their formulation.

11.     Plaintiff Josue Hernandez is domiciled in Florida. Plaintiff J. Hernandez purchased Urb brand delta-8 disposable devices and cartridges in 2023 and 2024 from smoke shops in Miami Beach, Florida. Plaintiff J. Hernandez purchased the Products for personal use to help with stress relief and relaxing after work. Plaintiff J. Hernandez specifically chose the Products because he wished to avoid the inebriation caused by delta-9 THC in traditional cannabis products. Plaintiff J. Hernandez resides in Florida where marijuana remains illegal to purchase, possess, and use. For this reason, among others, it was important to Plaintiff J. Hernandez that the Products he purchased contained less than 0.3% delta-9 THC.

12.     Plaintiff Sergio Hernandez is domiciled in Texas. Plaintiff S. Hernandez purchased an Urb brand delta-8 disposable device in 2022 from a smoke shop in Tyler, Texas. Plaintiff S. Hernandez purchased the Product for personal use to help with stress relief. Plaintiff S. Hernandez resides in Texas where marijuana remains illegal to purchase, possess, and use. For these reasons, among others, it was important to Plaintiff S. Hernandez that the Product he purchased contained less than 0.3% delta-9 THC

13.     Plaintiffs reviewed and relied on the Products' packaging before buying it, including the representation that the Products contained less than 0.3% delta-9 THC.

14.     If Plaintiffs had known the Products were falsely labeled and in fact contained a higher level of delta-9 THC than the legal limit, Plaintiffs would not have bought the Products.

15.     Plaintiffs will be unable to rely on the Products' labeling and advertising in the future, and so will be unable to purchase the Products in the future, although they would like to. Plaintiffs continue to purchase what they believe are delta-8 and delta-10 products, although they do not currently purchase the Products, and intend on continuing purchasing delta-8 and delta-10 products in the future.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Defendant.

17.     This Court has general jurisdiction over Defendant because it is an Illinois corporation, incorporated under the laws of Illinois in 2020. Further, the Court has general jurisdiction over Defendant because Defendant conducts substantial business within Illinois such that Defendant has significant, continuous, and pervasive contacts with the State of Illinois.

18.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant is incorporated in the State of Illinois, Defendant's registered agent is in this District, part of the events, omissions, and acts giving rise to the claims herein occurred in this District, and because Defendant engages in continuous and systematic business activities within this District.

## FACTUAL ALLEGATIONS

19.     Delta-8 and delta-10 THC vape products experienced a dramatic surge in popularity following the 2018 Farm Bill's legalization of hemp-derived products. What began as

a niche market rapidly expanded into a multi-billion-dollar industry, with vape pens and cartridges appearing in convenience stores, smoke shops, and online retailers across the nation.

20.     This dramatic market growth was driven by several factors. The legal gray area created by the Farm Bill allowed hemp-derived cannabinoids to be sold in states where traditional cannabis remained illegal. Alongside widespread availability, there was an increased consumer interest in alternatives to traditional cannabis for managing stress and anxiety.

21.     Delta-8 and delta-9 THC are similar but distinct chemical compounds found in cannabis plants. The key difference is in their molecular structure – delta-8 THC has a double bond on the 8th carbon chain, while delta-9 THC has this bond on the 9th carbon chain. Delta-8 is often produced by chemically converting CBD extracted from hemp, rather than being directly extracted from cannabis plants like delta-9 THC. Delta-10 shares similarities with delta-8 in that it is produced by chemically converting compounds extracted from hemp.

22.     All of these compounds can produce psychoactive effects by binding to cannabinoid receptors in the brain, but delta-8 and delta-10 typically produce milder effects compared to delta-9. Delta-9 THC is the primary psychoactive compound in what is commonly called marijuana and is more potent, often producing stronger euphoric effects and potentially more anxiety or paranoia in some users. Delta-8 and delta-10 are generally reported to produce a clearer-headed, less intense sensation with lower anxiety potential.

23.     From a legal standpoint, delta-9 THC derived from marijuana is a federally controlled Schedule 1 drug. On the other hand, delta-8 and delta-10 products derived from hemp are legal to sell, purchase, and possess in many jurisdictions so long as the products contain less than 0.3% delta-9 THC.

24.     Consumers typically choose delta-8 and delta-10 products for several key reasons. Many users seek these alternatives because they want milder psychoactive effects than traditional delta-9 THC provides. Consumers report delta-8 and delta-10 products offer a more subtle, clear-headed experience with less anxiety and paranoia, making them more suitable for daytime use or for people sensitive to traditional cannabis products.

25.     Users specifically choose these products seeking potential therapeutic benefits like anxiety relief or pain management, but with less intense psychoactive effects than they might get from regular cannabis products. The perceived reduced risk of adverse effects like anxiety attacks or overwhelming intoxication makes these alternatives appealing to newer users or those who find traditional cannabis too potent.

26.     Legal accessibility is another major factor for consumers. In areas where traditional cannabis remains illegal, consumers turn to delta-8 and delta-10 products because they can often purchase them legally through retail stores and online vendors due to their hemp-derived status.

27.     Unfortunately, an exploding market often incentivizes manufacturers to cut corners. When demand spikes, manufacturers face pressure to increase production volume quickly while keeping prices competitive. This can lead them to rush quality control processes, use cheaper and potentially unsafe ingredients or solvents in extraction, or outsource production to less reputable facilities. In the case of cannabinoid products, this might mean inadequate testing of THC levels, poor purification of extraction solvents, or contamination from heavy metals or pesticides.

28.     The combination of high profit potential and minimal regulatory oversight creates opportunities for bad actors to enter the market rapidly. These manufacturers may intentionally

mislabel products, skip crucial safety testing steps, or operate out of uncontrolled environments without proper manufacturing protocols. Rather than investing in proper equipment, training, and quality control, they focus on maximizing short-term profits while the market is hot.

29.     This case concerns the manufacture and marketing of delta-8 and delta-10 products that contain greater than 0.3% delta-9 THC. As explained above, when manufacturers misrepresent delta-9 THC content in delta-8 and delta-10 vape products, consumers face serious risks to their health, safety, and livelihood. Users who choose these products specifically for their advertised low delta-9 THC content may unexpectedly experience stronger psychoactive effects than intended, which can lead to anxiety, panic attacks, impaired coordination, and dangerous situations like driving while unknowingly intoxicated. This misrepresentation is particularly harmful for individuals who need to maintain sobriety for employment or medical reasons.

30.     The deceptive labeling can also have devastating personal consequences for consumers who rely on the accuracy of THC content for drug testing compliance. Individuals may fail workplace or legal drug screenings due to consuming higher levels of delta-9 THC than disclosed, potentially resulting in job loss, revocation of professional licenses, loss of custody rights, or violations of probation or parole requirements. This is particularly true in states where delta-9 THC from cannabis remains illegal both federally and at the state level. The manufacturer's dishonesty thus threatens not just consumers' immediate physical safety, but their economic security and personal freedom as well.

31.     Defendant designs, manufactures, advertises, distributes, and sells a variety of delta-8 and delta-10 vape pens and cartridges under its in-house brand, Urb, both online at www.urb.shop and in retail stores across the United States.

32. The labels of each of the Products contain the representation: "<.3% D9 THC." *See* Exhibit A.

33. Indeed, federal and state laws require the Products to contain less than 0.3% delta-9 THC before Defendant can lawfully manufacture and sell the Products in states like Texas and Florida, among others. Even without the direct representations on the Products' labels, consumers who are shopping for delta-8 and delta-10 products in states where marijuana is illegal reasonably assume that a product being sold online that can be shipped to their state, or a product being sold in a local smoke shop, complies with federal and state laws and must contain less than 0.3% delta-9 THC.

34. And yet, an independent laboratory retained by Plaintiff's counsel testing showed that the Products in fact contain greater than 0.3% delta-9 THC. Every sample tested contained between 1.35% - 3.99% delta-9 THC, or 450% - 1,330% more than permitted by federal and state law and than represented on the Products' labels.

35. Therefore, Defendant's label representations are false and misleading. Contrary to Defendant's material representations, the Products do not contain less than 0.3% delta-9 THC.

36. With respect to the Products, Defendant knew that one of the most important, material label representations to consumers is the statement that the Products contain less than 0.3% delta-9 THC. Defendant made this prominent statement with knowledge that it is false and/or misleading to reasonable consumers. By deceiving consumers and regulators about the content of its Products, Defendant takes away market share from competing products, thereby increasing its own sales and profits.

37. Consumers lack the ability to test or independently ascertain the specific compounds in a vape product and their concentrations at the point of sale. Reasonable consumers

9

must and do rely on Defendant to honestly report the nature of the Products and their contents, and to comply with all federal and state laws when designing, manufacturing, distributing, and selling the Products.

38.     Defendant intended for consumers to rely on its representations, and hundreds of thousands of consumers did in fact so rely. As a result of its false and misleading labeling and marketing, Defendant was able to sell the Products to hundreds of thousands of consumers throughout the United States and to profit handsomely from these transactions.

39.     Defendant's deceptive packaging and marketing at issue here was consistent during the last four years.

40.     Notably, the "<.3% D9 THC" representation is not disclaimed or modified anywhere on the Products' labels. No asterisk or marking appears by the representation that would suggest to a reasonable consumer that they need to look elsewhere on the label to understand the true meaning. Because the statement appears effectively as one of the main claims on the label of the Products, reasonable consumers interpret them at face value: that the Products literally contain less than 0.3% delta-9 THC and are legal to purchase, possess, and use under federal law.

41.     Defendant deceptively and misleadingly conceals other material facts about the Products, including: (a) the true nature of the Products' ingredients; (b) that the Products contain greater than 0.3% delta-9 THC; (c) that the Products are not legal to purchase, possess, or use under federal law, and many state laws; and (d) that the Products are a Schedule 1 drug due to the delta-9 THC content.

42.     To this day Defendant continues to conceal and suppress the existence, identity, nature, and concentration of delta-9 THC in the Products.

43.     Similarly, to this day, Defendant continues to conceal and suppress the fact that the Products are not legal to possess, purchase, or use under federal law and many state laws.

44.     Both Plaintiffs contend that on occasion they would experience a heightened sense of inebriation and intoxication while using the Products.

45.     Both Plaintiffs contend that had they known the Products contained an illegal amount of delta-9 THC greater than 0.3%, they would not have purchased the Products.

46.     Based on Defendant's representations and marketing materials, Plaintiffs and reasonable consumers would not expect that the Products would contain an illegal amount of delta-9 THC greater than 0.3%.

47.     Plaintiffs purchased the Products to their detriment, as did members of the putative classes.

48.     Plaintiffs purchased the Products for personal use, including to lawfully manage stress.

49.     The price paid by Plaintiffs was representative of the price paid by similarly situated consumers who purchased the Products.

50.     The representations on the Products purchased by Plaintiffs were the same as the representations purchased by members of the putative classes.

51.     Acting reasonably under the circumstances, Plaintiffs relied on Defendant's representations for the truth of the matter stated.

52.     Defendant intentionally represented that the Products contained less than 0.3% delta-9 THC on the Products' label in order to be permitted to sell the Products to consumers in the first place, and to induce purchases and increase sales of the Products.

11

53.     Manufacturers are able to charge a price premium for legally compliant products that are labeled as compliant with federal law. Defendant intentionally included the representations at issue on the Products' label and in marketing materials to increase sales and/or charge a premium for the Product.

54.     Defendant knew or should have known that reasonable consumers would consider the representations material in deciding to purchase the Products.

55.     Defendant knew or should have known that the representations could plausibly deceive reasonable consumers into believing that the Products contained less than 0.3% delta-9 THC and were lawful to purchase, possess, and use.

56.     Reasonable consumers ascribe a common meaning to words on product labels.

57.     Reasonable consumers rely on product labels for their truth and accuracy.

58.     Reasonable consumers are not required to conduct independent research to determine the truth of label statements.

59.     Reasonable consumers are not expected to look beyond misleading representations on the label of a product or in marketing materials to determine whether they are false.

60.     Instead, it is the responsibility of product manufacturers to accurately label their products in a manner that is not misleading.

61.     Plaintiffs and reasonable consumers reasonably believed that the statements on the Products' label were true regarding their content and legality.

62.     As described herein, Defendant's representations are literally false.

63.     Accordingly, there is no "common sense" interpretation of the representations that would overcome their falsity.

64.     At the time Plaintiffs and reasonable consumers purchased the Products, Plaintiffs and consumers did not know, and had no reason to know, that the representations were misleading, deceptive, and unlawful. Plaintiffs and consumers would not have purchased the Products if they had known the truth.

65.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiffs and putative class members in that they: (a) paid a sum of money for a product that was not as represented; (b) paid a premium price for a product that was not as represented; (c) were deprived the benefit of the bargain because the Products they purchased were different from what Defendant warranted; (d) were deprived the benefit of the bargain because the Products had less value than what was represented; (e) did not receive a product that measured up to their expectations as created by Defendant; (f) used a product that Plaintiffs and the members of the classes did not expect or consent to; (g) used a product that was unlawful to purchase, possess, and use; (h) without their knowing consent, used a substance that is potentially harmful to their health or which could jeopardize their economic security and personal freedom; (i) without their knowing consent, used a substance containing an unlawful level of delta-9 THC.

66.     Accordingly, Plaintiffs and class members have suffered injury in fact and lost money or property because of Defendant's wrongful conduct.

67.     As the intended, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant has been unjustly enriched through more sales of falsely labeled product and higher profits at the expense of Plaintiff and class members. As a direct and proximate result of its deception, Defendant also unfairly obtained other benefits,

including the higher value associated with a legally compliant brand, redirecting sales to it and away from its competitors, and increased sales of its Product.

## **CLASS ALLEGATIONS**

68.     ***Class Definition***: Plaintiffs bring this action on behalf all people in the following classes and subclasses (collectively referred to as "Class Members"), with Plaintiff Young representing the Texas Subclass and Plaintiff Hernandez representing the Florida Subclass specifically:

(a).    Nationwide Class: all people in the United States who purchased the Products for personal or household use during the last four years.

(b).    Texas Subclass: all people in Texas who purchased the Products for personal or household use during the last four years.

(c).    Florida Subclass: all people in Florida who purchased the Products for personal or household use during the last four years.

(d).    Multi-State Warranty Class: all people who purchased the Products for personal or household use (1) in Alaska, Arkansas, California, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, or Wyoming within the applicable statute of limitations; or (2) in Colorado or Massachusetts within the applicable statute of limitations.

69.     Subject to additional information obtained through further investigation and discovery, the foregoing class definitions may be expanded or narrowed by amendment or in the

motion for class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

70.     Specifically excluded from the putative classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

71.     ***Numerosity***. Class Members are so numerous that their individual joinder herein is impracticable. On information and belief, each Class or Subclass includes hundreds of thousands of consumers. The precise number of Class Members and their identities are unknown to the Plaintiffs at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant, its agents, or other means.

72.     ***Commonality and Predominance***. Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

(a)     Whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b)     Whether the omissions and representations on the Products' label and the Products' marketing materials, or any single omission or representation, is false, misleading, and/or deceptive;

(c)     Whether Defendant's conduct in advertising and selling the Products amounted to unlawful, unfair, and/or deceptive business practices;

(d)     Whether Defendant breached an express and/or implied warranty created through the labeling and marketing of its Products;

(e)     Whether Plaintiffs and the Class Members are entitled to equitable and/or injunctive relief;

(f)     Whether Plaintiffs and the Class Members have sustained damage as a result of Defendant's unlawful conduct;

(g)     The proper measure of damages sustained by Plaintiffs and the Class Members; and

(h)     Whether Defendant was unjustly enriched by its unlawful practices.

73.     ***Typicality***. The claims of the Plaintiffs are typical of the claims of the Class Members in that Plaintiffs and the Class Members sustained damages as a result of Defendant's uniform wrongful conduct, as alleged above.

74.     ***Adequacy***. Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the classes. Plaintiffs have no interests that are antagonistic to those of the Class Members. Plaintiffs have no past or present financial, employment, familial, or other relationship with any of the attorneys in this case that would create a conflict of interest with the proposed Class Members.

75.     ***Superiority***. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for Class Members; the Class Members are readily definable; prosecution as a class action avoids repetitive litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

76.     Defendant has acted or failed to act on grounds generally applicable to the Class Members, thereby making appropriate final injunctive relief with respect to the Class Members as a whole.

77.     Without a class action, Defendant will continue a course of action that will result in further damages to the Plaintiffs and Class Members and will likely retain the benefits of its wrongdoing.

78.     ***Presuit notice.*** On August 22, 2024, Plaintiffs provided Defendant pre-suit notice in a letter that complied with all applicable notice requirements. Defendant's counsel received that notice, and subsequently responded on September 3, 2024 confirming receipt.

## <u>COUNT I</u>
## Breach of Implied Warranty

79.     Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

80.     Plaintiffs bring this cause of action individually and on behalf of Class Membersthe Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses against Defendant.

81.     Each Plaintiff asserts this cause of action under the laws of the state where they are domiciled.

82.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that the Products were specially formulated to contain less than 0.3% delta-9 THC and comply with federal law, when that is not true.

83.     Defendant breached its warranty implied in the contract for the sale of the Products because they could not pass without objection in the trade under the contract description: the Products were not adequately contained, packaged, and labeled as per

Defendant's contract with Plaintiffs and members of the Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products. U.C.C. §§ 2-313(2)(a), (e), (f). As a result, Plaintiffs and members of the Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses did not receive the goods as impliedly warranted by Defendant to be merchantable.

84.     Plaintiffs and members of the Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

85.     The Products were defective and unlawful to purchase, possess, and use when they left the exclusive control of Defendant.

86.     Plaintiffs and members of the Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses did not receive the goods as warranted.

87.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and members of the Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses have been injured and harmed because: (a) they would not have purchased the Products if they knew the Products contained greater than 0.3% delta-9 THC and were unlawful to purchase, possess, and use under federal and their respective state laws; and (b) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

88.     Plaintiffs provided reasonable pre-suit notice of this claim.

89.     Plaintiffs seek all available relief under this cause of action.

## COUNT II
### Breach of Express Warranty

90.     Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

91.     Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses against Defendant.

92.     Each Plaintiff asserts this cause of action under the laws of the state where they are domiciled.

93.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the products at issue, expressly warranted that the Products were specially formulated to contain less than 0.3% delta-9 THC and comply with federal law, when that is not true. The warranty was part of the description of the goods and the bargain upon which the goods were offered for sale.

94.     By falsely representing that the Products contained less than 0.3% delta-9 THC and comply with federal law, Defendant breached its express warranty.

95.     Plaintiffs and members of the Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses did not receive the goods as warranted.

96.     As a direct and proximate cause of Defendant's breach of the express warranty, Plaintiffs and members of the Nationwide Class, the Multi-State Warranty Class, and the Texas and Florida Subclasses have been injured and harmed because: (a) they would not have purchased the Products if they knew the Products contained greater than 0.3% delta-9 THC and were unlawful to purchase, possess, and use under federal and their respective state laws; and (b) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

97.     Plaintiffs provided reasonable pre-suit notice of this claim.

98.     Plaintiffs seek all available relief under this cause of action.

## COUNT III
## Unjust Enrichment

99.     Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

100.    Plaintiffs bring this cause of action individually and on behalf of all other Class Members against Defendant.

101.    Each Plaintiff asserts this cause of action under the laws of the state where they are domiciled.

102.    To the extent required, Plaintiffs assert this cause of action in the alternative to legal claims, as permitted by Rule 8.

103.    Plaintiffs and the Class Members conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

104.    Defendant knew of the benefit conferred on it by Plaintiffs and the Class Members.

105.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Class Members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Products contain greater than 0.3% delta-9 THC and are illegal to purchase, possess, and use. This caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts concerning the Products had been known.

106.    Defendant accepted and retained the benefit in the amount of the gross revenues derived from sales of the Products to Plaintiffs and Class Members.

107.    Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

108.    Plaintiffs and Class Members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

109.    As a direct and proximate result of Defendant's actions, Plaintiffs and the Class Members have suffered in an amount to be proven at trial.

110.    Putative Class Members have suffered an injury in fact and have lost money as a result of Defendant's unjust conduct.

111.    Putative Class Members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

## COUNT IV
### Fraud by Omission / Intentional Misrepresentation

112.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

113.    Plaintiffs bring this cause of action individually and on behalf of all other Class Members against Defendant.

114.    Each Plaintiff asserts this cause of action under the laws of the state where they are domiciled.

115.    This claim is based on fraudulent omissions and intentional misrepresentations concerning the molecular makeup of the Products and the fact that they contain greater than 0.3% delta-9 THC and are illegal to purchase, possess, and use. As discussed above, Defendant failed to disclose: (a) the true nature of the Products' ingredients; (b) that the Products contain greater than 0.3% delta-9 THC; (c) that the Products are not legal to purchase, possess, or use

under federal law, and many state laws; and (d) that the Products are a Schedule 1 drug due to the delta-9 THC content. Further, Defendant intentionally misrepresented: (a) the true nature of the Products' ingredients; (b) that the Products contain greater than 0.3% delta-9 THC; (c) that the Products are legal to purchase, possess, or use under federal law, and many state laws; and (d) that the Products are not a Schedule 1 drug due to the delta-9 THC content.

116.   The false and misleading omissions and misrepresentations were made with knowledge of their falsehood. Defendant knew the true nature of the Products and their legal status. Nonetheless, Defendant continued to sell the Products using the false and misleading omissions and misrepresentations alleged herein to unsuspecting consumers.

117.   The false and misleading omissions and misrepresentations were made by Defendant, upon which Plaintiffs and Class Members reasonably and justifiably relied, and were intended to induce and actually induced Plaintiffs and Class Members to purchase the Products.

118.   The fraudulent actions of Defendant caused injury to Plaintiffs and Class Members, who are entitled to damages and punitive damages.

119.   Plaintiffs seek all relief available under this cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.  For an order certifying the classes, naming Plaintiffs as the representative of their respective classes, and naming Plaintiffs' counsel as Class Counsel for the certified classes;

b.  For an order declaring Defendant's conduct violates the statutes referenced herein;

c.  For an order finding in favor of Plaintiffs and the classes on all counts asserted herein;

d.  For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief;

g.  For injunctive relief as pleaded or as the Court may deem proper; and

h.  For an order awarding Plaintiffs and the classes their reasonable attorney fees, expenses, and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs request a jury trial on all issues so triable.

Dated:  November 19, 2024                Respectfully submitted,

*/s/ Joel D. Smith*

**SMITH KRIVOSHEY, PLLC**
Joel D. Smith (General bar)
E-Mail:  joel@skclassactions.com
Aleksandr "Sasha" Litvinov (General bar admission forthcoming)
E-Mail:  sasha@skclassactions.com
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404

**SMITH KRIVOSHEY, PLLC**
Yeremey O. Krivoshey (General bar)
E-Mail:  yeremey@skclassactions.com
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000

*Attorneys for Plaintiffs*